Good morning. Thomas Boehm appearing for Appellant Bernard Picot, who is present in court, Your Honors. Actually, I think we're blessed. We have a judge from Michigan, and we also have an attellee from Michigan, who is present in court. I would like to reserve maybe three or four minutes of my time for rebuttal. This case comes after a decision in the district court granting a motion to dismiss for lack of specific personal jurisdiction over the defendant, Mr. Weston. This involves two claims asserted by Mr. Picot. The first is a declaratory relief claim intending that a contract that Mr. Weston asserts was formed, in fact was not formed. The second count is for intentional interference with a separate contract, one in which Mr. Picot and his partner, who was a plaintiff below Mr. Manos, entered into to sell a technology. The buyer of the technology was a company called HMR. And if it is agreeable, I will call the agreement that Mr. Weston asserts he formed with Mr. Picot, the oral agreement, and the HMR sales agreement I will refer to as the contract. There are two different analytical frameworks for looking at whether there's jurisdiction given these two different claims. On the oral agreement, because it is a contract, we look to the purposeful availment standard. And as I'm sure Judge Quist is aware, the standards in this circuit are much the same as they are in the sixth. As to the tort claim, the interference with the sales agreement, that contract, we look to whether or not Mr. Weston purposely directed his activities at the forum. Do you think that difference you just pointed out is still there? Well, it is there, Your Honor, but I think it has shrunk a little bit on the tort side of things. But it is robust on the purposeful availment. In Walden, essentially what happened was a law enforcement activity occurred in Georgia. The law enforcement officer had no contacts with California, did not intend to cause an effect. Nevada. Oh, I'm sorry. Nevada. You're absolutely right. Did not intend to cause an effect in Nevada. Performed his activities solely within the State of Georgia. And the Supreme Court, in reversing the Ninth Circuit decision in that case, said that one must look to the affirmative actions of the defendant who creates, by his own activity, connections with the forum state. Though it is still relevant that there be injury in the state of the forum, that by itself is not enough. Though it is still relevant that the plaintiff have contacts in the forum, by itself that is not enough. So what Walden stands for, Judge Tashima, is this. If you were looking at a tort analysis or a contract analysis, you have to look to the defendant's activity. The defendant's activity has to be purposeful. It cannot be random. It cannot be attenuated. And it has to be directly connected to the State. That's what the district court said existed here. It was all too attenuated. I'm sorry. I could not hear you. The district court. That was basically the approach of the district court. In this case? Yes. He said that the defendant's contacts are just. I agree that's what the district court. Too remote. Too attenuated. I agree. That's what the district court judge said in this case. But I disagree that that's the correct reading of the facts and the evidence. Tell us why. The reason why is because if you take purposeful availment first, what you have is Mr. Weston is asserting this oral agreement. Now, Mr. Picot doesn't have to lay down and say, well, I want jurisdiction, so I have to concede the merits of that assertion of the oral agreement. Mr. Picot is entitled to assert jurisdiction because of the assertion of that oral agreement. If, in fact, when one gets to trial on this case, the oral agreement is found to be valid, it will reveal that Mr. Weston established substantial long-term obligations with Mr. Picot to perform that contract in California with a direct economic benefit and impact in California. And that's where I think Judge Turell, Judge William Turell Hodges, made an error, Your Honor. But wasn't, as far as the record shows, wasn't that contract to be performed in Michigan? No. In fact ‑‑ Mr. Weston described himself what he was supposed to do, Your Honor. And if I might, he said that his job was to support Manos and Picot in marketing, looking for money, and assisting in demonstrations. He didn't do all of that in Michigan. Well, whatever the percentage is, Your Honor, and we don't have a precise way of knowing what that is, even what Mr. Picot ‑‑ or, excuse me, what Mr. Weston did in Michigan was designed to support Mr. Picot in California. That doesn't establish, as you say, under Walden, you know, substantial contact with this forum. Well, it does, Your Honor, in my view, for this reason. If I enter into a contract with you and I'm from Pennsylvania, and you're going to do what you claim, it is, I think, jurisdictionally impermissible for me to say, well, I only came to California a couple times to help you, but all the other help I gave you was from Pennsylvania. What I have done from Pennsylvania, and in this case what Mr. Weston did from Michigan, from Texas, from Mexico, and in part from California, was to assist in the marketing and the attraction of capital to this opportunity, so that he was under longstanding precedence from the circuit, Sinatra and Schwarzenegger, which had not been changed by Walden. He was affirmatively acting to promote and solicit business in California. Now, you have to remember, Your Honor, that what Mr. Weston said in his declaration was he was an owner of this technology. He was a partner with Mr. Bicot. When that technology that Mr. Weston is an owner of is being demonstrated in California to potential purchasers or investors, that is substantial connection with the forum. Robertson did he actually meet with potential investors in California? Did he actually meet with potential investors? In California or from California? He met with two, both of which were from California, and he met with them in California. For this particular technology that was? Yes. And it was all related to furthering the contract. Is that what you're representing? That's what the record shows, Your Honor. Now, those two potential investors, the first was Peter Workinson, and there is no dispute that he met and helped the demonstration for Workinson. In fact, following the demonstration for Workinson, Workinson wanted Mr. Weston to travel to Mexico, which he did. Workinson was in California. He had been procured by Mr. Bicot in California. The demonstration was in California of the technology that Mr. Weston said he owned. Did Weston actually initiate the contact with this potential investor? No. That was Bicot. Yes. Yes, absolutely. My question was what did Weston do to initiate contact or further relationships with potential investors from California? Well, I'm sorry if I misunderstood your question. What Mr. Weston did was once these investors had been procured by Mr. Bicot and were at the point of wanting a demonstration, on two separate occasions, Mr. Weston came here, he met with those investors, he assisted in demonstrations. The second potential investor or purchaser was ADP Technologies. They actually entered into a relationship that generated money that they were paying to, in this case, Manos and Bicot in California. They had suggested that they would create a facility near Sacramento, and while he was here assisting in the demonstration to ADP, Mr. Weston announced that he wanted to work for that enterprise in California. So what I think we have, Your Honors, is an admittedly out-of-state resident who has formed a partnership, according to his contentions, has formed a partnership, has become an owner of technology, has a self-described role in assisting Manos and Bicot in advancing this technology so that it is attractive to an investor. He does that from Michigan, but he does it in California as well. And whether you take it as a totality or you break it up, it is significant, it is not attenuated, it is not random, it is affirmative, it is intentional, and it caused an effect in California. So other than these two visits to California, is there anything else? Well, according to his declaration, Your Honor, he also invested $800,000 in this enterprise in California. How does that connect him with California? Well, the enterprise has a center in California. Mr. Bicot has opined or not opined but testified in his declaration that everything he did was either in or from California and that this technology, though it certainly had attractiveness to the automobile industry in the state of Michigan, also had far-reaching applications and was not limited to customers or potential investors in the automotive industry. In fact, if one goes into the record and reads Mr. Bicot's declaration about the contacts he made in attempting to attract investors to this technology, the bulk of it was in California. There was some in China. There was some in Europe. Well, that's Bicot. It's not Weston. Well, it's Bicot but not Weston, but you have to remember, Your Honor, these two people are, according to Mr. Weston, partners. You mean to say you can attribute the substantial contacts with the foreign states by Weston because he's partners with California? Not by that alone because that's what Walden says you cannot do. But when you add to it the fact that what Mr. Weston says he was doing in Michigan was intended to support this California activity, then I think you have jurisdiction. And that, of course, is only on the contract, the declaratory relief issue. You combine, you take the totality of a defendant's contacts and you don't dice them very thinly, you look at them all. When you come to the tort claim, what you have here is Mr. Weston, again, impacting the state of California in a very significant intentional way in order this time not to create or perform an agreement but to hold it hostage because he saw or he feared that he was not a party to it. And in this case, what he did was to first attempt to extort Mr. Coe here in California. He did that twice. Now, admittedly, he didn't come into California to do that, but one doesn't have to be physically present in order to have these contacts and certainly not to commit the crime of extortion. The crime of extortion is a contact with California. It's an offense against the people of the State of California. And here what Mr. Weston did was to say to Mr. Manos in an e-mail, let's find some secrets out about this. This is a tort claim. Yes. I'm moving into the tort claim, Your Honor.  What Mr. Weston did was to say let's find some secrets out about this. But your time is you know, you're way over your time. Okay. Well, let me reserve this. I'll give you a minute for rebuttal. All right. Thank you, Judge. Good morning, Your Honors. David Schwartz appearing for Dean Weston-Pelley. The record shows Mr. Weston's contacts with California in connection with the transaction that is the subject of the lawsuit. And here what Mr. Weston did in this case is he asked for the defense and the prosecution to come to, to meet at the John Maloney Koontz Manifesto Gary Pposyti Market. In fact, I believe on this particular case, he did put some money in and then withdrew. That's his physical contact with California, as opposed to over two years of working on a daily basis in Michigan. Furtherance of this purported agreement that these felons allegedly had entered into? At best, in an extremely tangential way, because what – let's remember, this is Mr. Picot's lawsuit, not Mr. Weston's lawsuit. Mr. Picot came to Michigan. Mr. Weston had a discussion in Michigan with Mr. Picot in which they either did or did not create a partnership. There was a second – prior to that, there was a conversation between Mr. Weston and Mr. Manos in Michigan in which they either did or did not create a partnership with Mr. Manos representing he had the authority to bind Mr. Picot. That was back in Michigan, too. Pardon? I'm sorry. That was also back in Michigan. That's in Michigan. Yes. Mr. Weston operates almost exclusively in Michigan on a day-to-day basis with Mr. Manos coming from time to time to see what is going on and provide assistance. On the two occasions, Mr. Weston is asked to go to California to do demonstrations. The other contacts with California are Mr. Weston sends an e-mail to Mr. Manos in Nevada, which the plaintiff characterizes as a threat, but it was to Mr. Manos, not to Mr. Picot. Plaintiff contends, and then there's a phone call, which to Mr. Manos in Nevada, again characterized as a threat, which plaintiff says, well, clearly it was intended that that would be conveyed to Mr. Picot. But it was not even made directly to Mr. Picot in California. It was made to Mr. Manos in Nevada. If Mr. Picot had been in Colorado on that day, presumably the threat would have been conveyed to Mr. Picot in Colorado, or if he'd been in Paris, in Paris. That's the connection with California in each case. It's purely based on the unilateral activity of Mr. Picot. And Walden, if you go into the actual criticism of the appellate court's analysis that the Supreme Court makes in Walden, it says you first, you must focus on the defendants' contacts, not the plaintiffs' contacts, that the defendants' actions must show a connection to the forum State, not merely the plaintiffs' actions. And the defendants' contacts with a resident of the forum State by themselves will not establish specific jurisdiction. Every conduct which is in which Mr. Weston supposedly is availing himself of California is either something initiated by Mr. Picot asking him to come to California or is merely the result of Mr. Picot choosing to live in California. To what extent do these – I gather when he came out here to help assist with the demonstration, was this after the purported agreement became evident? This is after the purported agreement. So to what extent do subsequent actions of the defendants help play in the analysis? Do they even take – or can they even be considered as part of the purposeful availment analysis? The court – let me go to a case that's cited by both parties, GATX Capital v. Fifth Third Bank, which is actually discussing Burger King, I believe. And it says, well, the defendant must, quote, deliberately engage in significant activities within the forum State, or must create continuing obligations between himself and the resident in order to allow jurisdiction. A contract alone cannot establish sufficient minimum context. And if we focus on the defendant's conduct, is it sufficient when you look at the entirety? It also says that should be a highly realistic approach. Well, what is – what are the facts? We have three years of day-to-day, Monday through Friday or Monday through Saturday, whatever, work by Mr. Weston in Michigan. The formation of the contract, if it was formed in Michigan, the interference with the contract, the acts that are contended to be interference with the contract occurred in Michigan or Ohio. The only two physical acts of Mr. Weston in California were done at the specific request and instruction by Mr. Picot and Mr. Manos. What is the realistic view as to where this contract was to be performed? I would take another case that I think is illustrative of this, is Roth v. Marquez, which the plaintiff appellant is relying on to say, well, the checks in Roth v. Marquez, they were going to write the checks to Mr. Marquez from Los Angeles. But, in fact, if you look at what the actual holding of the case was, there was A, there were negotiations over the contract in California, and B, all of it was assumed and understood that the production and distribution of the movie would take place in California or from California. Here, Mr. Picot, there's nothing in this oral agreement that requires or necessitates Mr. Picot to be performing in California. He says he did that, but that's his unilateral choice. There's nothing that suggests that what he did in California he could not have done from Nevada, Colorado, Texas, Australia. So Mr. What has Mr. Weston done, even assuming he's entered into this agreement that says, I, we understand that you are going to be performing from California. We understand and agree. He did make two trips out here. He made the two trips at the request of Mr. Picot. And they could be reasonably construed as he came out here to do work in furtherance of the agreement. He came out to do work in furtherance of the agreement. The question is, does that constitute a substantial contact when it's at the request of the other party? When you say that, you mean just making two trips. Just making two trips to do demonstrations. And he did not, he was not soliciting investments in California. He was to demonstrate the project or something like that, right? Demonstrate the project. All right. So that was the extent of his personal, his being the defendant, Weston's personal contact with California that were related to the contract. Correct. What was the extent, there was two, the second trip that he made out here. He made both demonstrations. Both demonstrations? Physical demonstrations. What was the nature of the product or the technology that required? The technology. That required that he be out here in California to do the demonstration. They had developed a hydrogen cell technology for use in vehicles as an alternative to a petroleum product. And they had fixed up a demonstration vehicle to run on this hydrogen cell. And so that's what they were demonstrating in California. And when he came out here, did he fit, you know, did he prep the demonstration vehicle? Did he do all the mechanics of it? I think he did the mechanics of it. I'm not sure specifically, but I believe he was at least, you know, that was his principal responsibility was to make sure this thing would run and a potential investor would see what it would look like. And hopefully invest. Hopefully invest. But I would also point out this is about investment. The lawsuit is about the sale of the technology. The agreement was, if there was an agreement, that they would share three ways the sale, the proceeds from the sale of the project. That's a sale to this Ohio company? That's to this person, people in Ohio and Australia. And if that was interfered with, that occurred in Michigan or Ohio. Even the threat, supposed threats that were supposedly directed at Mr. Picot in California, if you analyze it, that was a threat to disrupt a relationship in Ohio, not in California. Mr. Picot's contract had no meaningful relation, contract with HMR, had no meaningful relationship to California. Well, the only relationship was that he happened to be in California himself. That's correct. And he doesn't, as the record discloses, he doesn't even receive the money in California. The money goes to, I think it's Montana or Australia. So the only thing Mr. Picot does from California is decide how to, where the money should go. And from when it's received. And if Mr. Weston interfered with his right to get the money, Mr. Weston did that talking in Michigan and Ohio. And, you know, the way the Walden case analyzes and describes what it did in Calder, I think is instructive. It said that the reason there was jurisdiction in Calder was because of the nature of the tort of libel, which occurs wherever there is a publication. And the impact, which added to the reason to hold jurisdiction in California, even though the defendants had not physically been to California, was that the defendants knew and understood that the impact of their statement would be to disrupt actual relationships between the plaintiff and the plaintiff's business and social contacts in California by this libelous statement, these libelous statements. If you compare that to the facts here, where did the tort occur? Well, the tort occurred either in Michigan or Ohio when Mr. Weston spoke with Mr. Coates and said, I am an owner and I know the formula, which violated the warranties Mr. Picot had given to Mr. Coates, that there was no other owner and there was no one else who knew the formula. So if he did that, that happened in Ohio. And it disrupted a relationship in Ohio, not in California. Therefore, I think any way you look at the Walden, what Walden tells us, you have to come down and say there are no significant contacts that would permit specific personal jurisdiction in California. Okay. Thank you. Okay. I'll give you a minute for rebuttal. Can you ask a question of me? Answer a question that I have. I don't want to take the whole minute. At the conclusion of Walden, the court said, and it is the defendant, not the plaintiff, or third parties who must create contacts for the form state. In this case, the application of those principles is clear. Petitioners' relevant conduct occurred entirely in Georgia. And the mere fact that his conduct affected plaintiffs with connections to the form state does not suffice to authorize jurisdiction. So what is the relevant conduct to your specific claim that you're relying upon to establish jurisdiction in California? The relevant conduct, Your Honor, is simply this. That goes to your claim, though, about, you know, this interference with your contract. I understand your question, I believe. In order to assess whether or not there are sufficient minimum contacts, this circuit's precedent says you look at the totality of what the defendant did, even though not every single component of it would support jurisdiction over a given claim. Here we have the entire lead-in to the oral agreement and the performance of it. And then when you get to the tort, what you have is the sending into California of extortionate demands that says, if you do not pay me, I will find secrets and expose you or I will ruin you. Now, yes, those did not come physically into California. They went to Mr. Manos in Nevada with the expectation and, in fact, the express question from Mr. Weston to Mr. Manos. It does not, because what that does, Your Honor, with all due respect, is to cut off everything that came before and say, we only look at the day he sent the extortionate e-mail, we only look at what he did in Ohio or what he did in Michigan when he tried to interfere with his contract. But this was a continuing course of conduct that had started with the oral agreement in, according to Mr. Weston, February of 2009 and culminated in March of 14 or, I'm sorry, March of 12 with his interference with this contract when he didn't get what he believed he was entitled to. That is and, Your Honor, to me, this is a very important point, because both in the Sixth Circuit and in the Ninth Circuit, the defendant's entire course of conduct has to be analyzed. And what Mr. Weston has advocated on this appeal, as he did in the trial court below, is you only look at each particular component individually and in isolation. And when you do that, you don't see any connection. You don't see all the dots coming together to form a pattern, a course of conduct I've got here. Roberts. Okay. A couple points, Judge. Well, make them quick. I will make it very quick. The fact that Mr. Weston was asked to come to California to demonstrate this does not change whether he purposely availed himself of California by coming here. If, when one reads the record closely, one sees that what Mr. Weston first said was, I spoke with Mr. Picot in Michigan in 2009, and we formed an agreement. Then all of a sudden, it was, no, I only did that in 2010. He was in California in 2009 in performance of this agreement. The one point counsel made, and I will rest on this, is that a mere contract with a forum resident is not purposeful availment, and I agree. But if that contract calls for and actually results in substantial performance in California or from outside California to support California-based activity, then it rises to the level of minimum contracts. It is not looking at the fact that Mr. Picot happened to reside in California. It is looking at the fact that what Mr. Picot did under what Mr. Weston claims was the oral agreement was done in California and created a substantial impact on the state of California that Mr. Weston supported and came here physically twice to support. And with that, I would ask you to reverse, and thank you. Thank you very much, counsel. We appreciate your arguments, and the matter is submitted at this time.
judges: Quist, Tashima, Paez